UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| CHAN WILLIAMS, ) | |
| ) | Case No. 3:20-cv-426 |
| *Plaintiff*, ) | |
| ) | Judge Travis R. McDonough |
| v. ) | |
| ) | Magistrate Judge Debra C. Poplin |
| RELIANCE STANDARD LIFE ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| *Defendant*. | |

# MEMORANDUM AND ORDER

In this action, Plaintiff Chan Williams seeks judicial review of Defendant Reliance Standard Life Insurance Company's ("Reliance") decision to deny his claim for long-term disability ("LTD") benefits pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 101 *et seq.* ("ERISA"). Williams alleges that Reliance acted arbitrarily and capriciously in determining that he was not eligible for benefits under the applicable policy.

Williams has moved for judgment on the administrative record. (Doc. 21.) For the following reasons, Williams's motion for judgment on the administrative record (Doc. 21) will be **GRANTED** to the extent this matter is **REMANDED** to Reliance for a full and fair review that is consistent with this memorandum and order.

## I.     BACKGROUND

### A.     Williams's Employment with Old Dominion and Long-Term Disability Insurance Policy with Reliance

Williams worked as a Dock Supervisor for Old Dominion Freight Line, Inc. ("Old Dominion). (Doc. 14-1, at 327, 361.) As a part of his employment, Williams was required to be

able to "remain standing and/or walking for a minimum of 8 hours per day, five to seven days per week," "walk on non-forgiving surfaces such as concrete, wood, and metal and sometimes on wet and slippery surfaces," "bend, twist, climb, and move about easily in small spaces," "lift objects weighing in excess of 100 lbs.," and "load and unload full trailers of freight weighing as much as 50,000 lbs." (*Id.* at 361.) His job description further indicated that loading and unloading trailers could involve: (1) moving 100 lb. containers to and from floor level to carts, stacks, or platforms over 4 feet high; (2) balancing 300 lb. drums on their rims and rolling them into positions; or (3) stowing cartons or other merchandise overhead that weighed as much as 100 lbs. each. (*Id.*)

Williams stopped working at Old Dominion on April 9, 2016, after falling using a weed whacker at his home. (*Id.* at 322, 330.) Williams had an LTD policy with Reliance, which covered Williams in the event of "Total Disability." The LTD policy defines "Total Disability" to mean that, as a result of injury or sickness:

> (1) during the Elimination Period and for the first 36 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation;
>
> . . .
>
> (2) After a Monthly Benefit has been paid for 36 months, an insured cannot perform the material duties of Any Occupation. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Fulltime basis.

(*Id.* at 10.) The policy defines "Any Occupation" as "an occupation normally performed in the national economy for which an Insured is reasonably suited based upon his/her education, training or experience." (*Id.* at 9.)

Reliance concluded that Plaintiffs' "Regular Occupation" per the policy was that of a

2

Case 3:20-cv-00426-TRM-DCP   Document 26   Filed 07/29/21   Page 2 of 17   PageID #: 746

"Material Handler" and "Shipping-and-Receiving Supervisor," which required exerting fifty to one hundred pounds of force occasionally, twenty-five to fifty pounds of force frequently, and ten to twenty pounds constantly. (*Id.* at 179.) After his weed-whacking injury, Williams applied for LTD benefits, and based on the foregoing policy and Williams's medical evaluations as further described below, Reliance paid benefits to Williams through July 9, 2019. (*Id.* at 298.)

On April 22, 2019, Reliance terminated Williams's benefits effective July 9, 2019, asserting that Williams did not qualify as disabled for "Any Occupation" under the policy. (*Id.* at 298–302.) Reliance ultimately concluded that, although Williams could no longer perform the duties of his Regular Occupation, he was able to perform several alternative occupations full time. (Doc. 14-1, at 300–01; Doc. 14-2, at 206.) Williams appealed the termination of his benefits on December 23, 2019, and included an independent medical examination from orthopedic surgeon Dr. William E. Kennedy finding that he was not capable of full-time sedentary work. (Doc. 14-2, at 209–17.) Reliance upheld its denial in a final decision dated April 3, 2020, stating that its file-reviewing physician determined that Williams could, in fact, perform full-time sedentary work and that its vocational consultant found several transferrable sedentary occupations available for Williams. (Doc. 14-1, at 310–17.)

### i. *Williams's Medical History*

Since April 2016, Williams has been treated by several doctors and medical professionals. Plaintiff's initial disability application, filed in 2016, reported that he had "back pain" and "numbness in his lower leg and foot," and that he had undergone back surgery but was expected to return to work with his doctor's permission. (*Id.* at 330.) Dr. Todd Abel completed the attending physician's portion of Williams's disability application in June 2016. (Doc. 14-2, at 25.) Williams had an L4-5 and L5-S1 lumbar discectomy performed a few months prior in

3

April 2016, but in August 2016, Dr. Abel noted Williams reported that he continued to suffer back pain and lower extremity pain when attempting to lift and move a ten-pound box. (*Id.*) While Dr. Abel did not explicitly state that he believed Williams was incapable of any work at all, he did opine that "Williams [was] not able to have work restrictions removed" at that time and noted that "[w]e may need to decide at some point whether to continue to pursue this current job or try and find something less physically demanding." (*Id.*)

In a follow-up appointment in October 2016, Dr. Abel noted that Williams still suffered from a "significant amount of back pain and some radicular leg pain" and that he could not sit or stand for more than fifteen to twenty minutes at a time. (*Id.* at 28.) At this point, Dr. Abel concluded that Williams had reached "maximum medical improvement" after his discectomy, that he was incapable of strenuous activity, and that it would be difficult, albeit not impossible, for him to do office-based work where he was continually alternating sitting and standing. (*Id.*)

Williams had another follow-up appointment in January 2017, this time with Dr. Emmett Manley. (*Id.* at 30.) Williams reported to Dr. Manley that he continued to have a "significant amount of back pain and radicular pain" and that "he has to shift every 15 to 20 minutes and there is no way he is able to stand for 10 to 15 minutes before he has to sit back down." (*Id.*) However, in his physical exam his strength was "5/5," and he asked to be followed "conservatively" after the appointment. (*Id.*)

In March 2017, Dr. Manley again evaluated Williams and noted that Williams was experiencing high blood pressure. (*Id.* at 73.) The next month, in April 2017, Williams was treated by his cardiologist, Lisa Dugger, NP, A.A.C.C., for chest pain radiating into his neck and left upper extremity. (*Id.* at 86.) He was also experiencing palpitations and tachyarrhythmia and recently had a back spasm which progressed to the point of syncope. (*Id.*) That same month,

4

Williams had a CT scan performed on his cervical spine that showed "mild multilevel disc space narrowing" and facet arthropathy, and Dr. Manley noted that Williams had lumbar degenerative joint disease and spasms. (*Id.* at 46, 62, 93.)

Shortly thereafter, in June 2017, Williams saw two more treating providers. Helen Joyce Kaye, NP-C, noted in a physical examination of Williams that he had "posterior neck pain to palpation, limited flexion and extension of his cervical spine due to pain," "low back pain to palpation," and "decreased sensation in his left foot." (*Id.* at 44.) Kaye also opined that a CT scan of Williams's cervical spine "show[ed] multilevel cervical spondylosis with a large osteophytic complex at C5-6 more eccentric to the left" with "significant degenerative disc disease at L4-5 and L5-S1." (*Id.* at 44–45.) Duggar also examined Williams again and noted that Williams was continuing to complain of significant back problems, leg pains from prolonged sitting or standing, and tingling and numbness in his legs and feet. (*Id.* at 79–83.)

In April 2018, Kaye again examined Williams and noted he reported experiencing neck pain, arm pain, and numbness in both hands that "affect[ed] his activities of daily living." (*Id.* at 121.) During his physical examination, Kaye reported that Williams still had posterior neck pain to palpitation and limited flexion-extension of his cervical spine due to pain, as well as decreased sensation in his left hand and in the fourth digit of his right hand. (*Id.*) A few months later, in August 2018, Williams had another CT scan of his spine completed, and in September 2018, Kaye indicated that the CT scan showed degenerative changes in his cervical spine and severe left neural foraminal stenosis. (*Id.* at 130.) Kaye's physical examination further revealed that Williams was still experiencing neck pain, low back pain, limited flexion and extension of his lumbar spine, and decreased sensation in his hands and left leg. (*Id.*)

Dr. Manley examined Williams again in October 2018, stating that his evaluation

5

revealed lumbar and cervical degenerative joint disease, spasms, bilateral carpal tunnel syndrome, and benign essential hypertension. (*Id.* at 193–96.) In November 2018, Dugger evaluated Williams again because he was experiencing sharp cramping pain followed by weakness and light-headedness before passing out. (*Id.* at 156.) Dugger explained that he was experiencing vasovagal syncope related to his leg pain and cramping. (*Id.* at 160.)

Shortly thereafter, in February 2019, Williams's treating cardiologist, Dr. James Cox, stated that Williams reported tingling, numbness, and cramping in his legs and feet. (*Id.* at 164.) However, Dr. Cox also reported that Williams did not have signs of edema or deformity and that he was "doing well. No syncope no near syncope . . . . No symptoms of hypotension. Overall is pleased with his current status." (*Id.* at 162.)

### ii. Reliance's Review of Williams's Medical Records

On April 22, 2019, Reliance told Williams that his medical records did not support the payment of long-term disability benefits after July 9, 2019. (Doc. 14-1, at 298–302.) In their denial letter, Reliance stated that:

> Based on medicals on file, you continue to report back pain, neck/hand numbness and pain, and leg cramping. Even with your reported numbness, you are able to groom and dress yourself. You do not require assistive devices to ambulate, and there is no evidence of pain management or extremity weakness. Your syncopal event in November 2018 was attributed to vasovagal response with no additional events reported. Therefore, our medical department opines that you are capable of frequent sitting with the ability to change positions, with no overhead reaching and a maximum lift of 10 pounds.

(*Id.* at 300.) These conclusions were based on the opinion of a "clinical consultant" who reviewed Williams's file. (*Id.* at 299.)

In response to the denial of his claim, Williams's former counsel referred him for an independent medical examination, which he underwent on November 13, 2019. (Doc. 14-2, at 211–17.) Williams's examination was completed by an orthopedic surgeon, Dr. William E.

6

Kennedy. (*Id.*)  After his examination, Dr. Kennedy concluded that Williams could only perform "sedentary work only part time." (*Id.* at 217.)  He explained that Williams is permanently limited in his endurance for standing and walking to no longer than about fifteen minutes at a time without significantly increasing his low back pain. (*Id.* at 216.)  He also concluded that Williams could not sit in one position for longer than about fifteen minutes at a time without increasing his low back pain, to the point where he needs to stand and walk for at least five minutes. (*Id.*)  Dr. Kennedy also opined that these limitations would worsen during an eight-hour workday, "leading increasingly to distractions away from any sedentary work he may try to perform." (*Id.*)  Finally, Dr. Kennedy concluded that Williams could not bend, twist, stoop and squat, lean, reach, pull, or kneel, and he could not lift and carry more than ten pounds occasionally without significantly increasing his low back pain. (*Id.* at 216–17.)  After Dr. Kennedy's evaluation, Williams appealed the termination of benefits on December 23, 2019. (*Id.* at 209–10.)

In February 2020, Reliance retained a third-party vendor to secure an independent medical review of Williams's file. (*Id.* at 219–21.)  Dr. Arash Yaghoobian reviewed Williams's file and agreed that Williams has some level of impairment related to his ongoing cervical and lumbar degenerative disc disease, cervicalgia, lumbago, and lumbar laminectomy. (*Id.* at 228–32.)  In reaching his conclusions, Dr. Yaghoobian considered the reports, scans, and x-rays detailed above, including Dr. Kennedy's November 2019 evaluation. (*Id.* at 228–29.)  Specifically, Dr. Yaghoobian found there was medical data to substantiate Williams's subjective complaints because:

> The claimant has continued to have issues related with his cervical and lumbar spine.  Physical examination dated 11/13/2019 revealed mild well-localized tenderness in the midline of the lower lumbar region and bilaterally in the SI regions and adjacent facets at the lower lumbar levels, 2+ bilateral paraspinous

7

> muscle spasm of the lumbar region of his back. There is also evident weakness and positive SLR, suggestive of lumbar root disease despite surgical decompression. The claimant also remains with persistent neck pain symptoms. The visit notes indicated that the claimant has continued to have disabling symptoms despite the treatments.

(*Id.* at 230.) Ultimately, Dr. Yaghoobian concluded that "the claimant [Williams] requires permanent R&L's." (*Id.* at 231.)

Based on his review, Dr. Yaghoobian concluded that Williams is capable of: (1) standing occasionally, up to twenty minutes at a time for a total of three hours per day; (2) walking occasionally, up to fifteen minutes at a time for a total of two hours per day; (3) sitting frequently, up to thirty minutes at a time for a total of six hours per day; (3) lifting, carrying, pushing, or pulling occasionally up to ten pounds with his bilateral upper extremities; (4) climbing stairs occasionally; (5) kneeling occasionally; (6) crouching occasionally; (7) reaching overhead and below waist level occasionally, but frequently at the waist and desk level his bilateral upper extremities; and (8) stooping occasionally. (*Id.* at 231–32.) Dr. Yaghoobian also concluded that Williams could never climb a ladder or crawl. (*Id.* at 232.) After Dr. Yaghoobian's review, Reliance reviewed Williams's file again and determined that all of the alternative occupations it previously identified remained viable options for Williams. (Doc. 14-1, at 313–16.)

Reliance then sent its final report to Williams's former counsel, who challenged Dr. Yaghoobian's disagreement with Dr. Kennedy. (*Id.* at 240.) Dr. Yaghoobian then prepared an addendum, at the request of Reliance, which stated "[t]he claimant's listed restrictions are appropriate and consistent with Dr. Kennedy's recommendations of the claimant being able to perform sedentary work, however, I respectfully disagree with part-time recommendation only, as the claimant has no indication to alter work hours." (*Id.* at 242.) Relying on Dr.

8

Yaghoobian's opinion, Defendant denied Williams's appeal on April 3, 2020, and stated that its decision was final. (Doc. 14-1, at 310–17.) Williams brought the instant suit on October 1, 2020.

## II. STANDARD OF REVIEW

Under ERISA, when a policy contains a clear and express grant of discretion to the administrator of the policy, the court will not overturn the administrator's decision unless that decision is arbitrary and capricious. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The policy Reliance issued contains such a grant of discretion, and both parties agree that the arbitrary-and-capricious standard applies to this case. (Doc. 22, at 11; Doc. 23, at 9–10.)

Under the arbitrary-and-capricious standard, the administrator's decision must stand "if it is 'the result of a deliberate principled reasoning process' and 'supported by substantial evidence.'" *Shaw v. AT&T Ben. Umbrella Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015) (quoting *DeLisle v. Sun Life Assur. Co. of Can.*, 558 F.3d 330, 444 (6th Cir. 2009)). In short, if the administrator can offer a reasonable explanation as to its decision, the decision is not arbitrary and capricious. *Id.* The Court, however, is not required to blindly accept the decision of an administrator. "[A]rbitrary-and-capricious review is not a rubber stamp." *Id.* (quotation marks omitted) (quoting *Cox v. Standard Ins. Co.*, 585 F.3d 295, 302 (6th Cir. 2009)). Instead, the Sixth Circuit has outlined several factors to consider:

> "[T]he quality and quantity of the medical evidence"; the existence of any conflicts of interest; whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant.

*Fura v. Fed. Exp. Corp. Long Term Disability Plan*, 534 F. App'x. 340, 342 (6th Cir. 2013) (quoting *Bennet v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552–53 (6th Cir. 2008)); *see also*

9

*Shaw*, 795 F.3d at 547 (discussing same factors). Furthermore, in analyzing Reliance's decision, the court is limited to the facts "known to the plan administrator at the time he made his decision." *Yeager*, 88 F.3d at 380.

### III. ANALYSIS

Williams argues that Reliance's denial of long-term disability benefits was arbitrary and capricious because Reliance: (1) had a conflict of interest; (2) unreasonably ignored the opinions of his treating physicians; (3) failed to explain why it credited the file-reviewing doctor, Dr. Yaghoobian, over Dr. Kennedy; and (4) disregarded Williams's award of social security disability benefits. The Court will address these arguments in turn.

#### A. Conflict of Interest

Reliance has a conflict of interest due to its position as the administrator and payor of the policy in question. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112–15 (2008). Reliance does not dispute that this conflict exists, but rather what weight it should be given in determining whether its decision was arbitrary and capricious. (Doc. 23, at 11.)

The existence of a conflict of interest does not render a decision arbitrary and capricious. *Collins v. Unum Life Ins. Co.*, 682 F. App'x 381, 387 (6th Cir. 2017); *see also Cultrona v. Nationwide Life Ins. Co.*, 748 F.3d 698, 704 (6th Cir. 2014) ("[A] conflict of interest, standing alone, does not require reversal."). A conflict of interest is "simply another factor in evaluating the quality of [the plan administrator's] decision-making process." *Cultrona*, 748 F.3d at 704. However, the Sixth Circuit has observed that plan administrators have a clear incentive to contract with individuals who are inclined to find in their favor, and that possible conflict of interest should be taken into account when determining whether a plan administrator's decision is arbitrary and capricious. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).

Reliance ultimately relied on the findings of its file-reviewing retained physician, Dr. Yaghoobian, in denying Williams's benefits. Because there was a conflict of interest, this factor weighs in Williams's favor.

> **B. Reliance's Review of Medical Files and Acceptance of Dr. Yaghoobian's Findings**

Williams argues that his treating providers' records consistently support that he is disabled for "Any Occupation" as defined by his insurance policy. Specifically, Williams notes that Dr. Abel found that Williams had reached "maximum medical improvement" as early as October 2016 and that he would have difficulty doing work that required him to alternate between sitting and standing. He also states that Dr. Kennedy's evaluation in November 2019 confirmed that he has less than full-time sedentary capacity.

Many ERISA cases have conflicting medical opinions, and the administrator's decision "to rely upon the medical opinion of one doctor over that of another" does not render the decision arbitrary and capricious. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 170 (6th Cir. 2003). "[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Yet, a plan administrator cannot "arbitrarily refuse to credit a claimant's reliable evidence." *Id.* at 834. In other words, a rejection of another doctor's medical opinion cannot be done summarily; the plan administrator must "give reasons for adopting an alternative opinion." *Shaw*, 795 F.3d at 548–49. The question in any given disability case on "arbitrary and capricious" review is whether a plan can offer a reasoned explanation, based on the evidence, for its judgment that a claimant was not "disabled" within the plan's terms. *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006).

As an initial matter, Reliance's failure to order a physical examination, while a factor to

11

consider in determining whether its decision was arbitrary and capricious, is not enough alone to conclude that its decision was unreasonable. The Sixth Circuit has been clear that there is no rule as to when a plan administrator must order a physical examination. *Calvert v. Firstar*, 409 F.3d 286, 295 (2005); *Judge v. Metro. Life Ins.*, 710 F.3d 651, 663 (6th Cir. 2013). Instead, the Sixth Circuit has stated that a file review may be discredited if "the file reviewer concludes that the claimant is not credible without having actually examined him or her" or "the plan administrator, without any reasoning, credits the file reviewer's opinion over that of a treating physician." *Judge*, 710 F.3d at 663 (citing *Bennett*, 514 F.3d at 555). The Sixth Circuit, however, has not held that questioning a claimant's credibility alone is sufficient to render a decision arbitrary and capricious. Instead, the reviewer's determination must contradict the available objective evidence. *See Bennett*, 514 F.3d at 555 (discrediting a file review after the reviewer contradicted his own conclusions, ignored record evidence, and determined the plaintiff was not credible with no physical examination.) Therefore, a file review is appropriate when the reviewer reasonably relies on the available objective evidence and that evidence itself is credible.

In this case, it may have been reasonable for Reliance to rely upon the opinions of its file-reviewing doctor instead of the opinions of Dr. Abel and Williams's other treating physicians if Dr. Kennedy's opinion did not exist. Dr. Yaghoobian reviewed all the medical evidence detailed above, including Dr. Abel's 2016 examination stating that Williams had reached "maximum medical improvement." (Doc. 14-2, at 601–03.)

It is important to remember that, at this stage, the question is not whether Williams is disabled, but whether he has a total disability that prevents him from performing any occupation under the policy. Even the most favorable reading of Dr. Abel's reports in conjunction with the reports of Williams's other treating physicians does not necessarily compel the conclusion that

12

Case 3:20-cv-00426-TRM-DCP   Document 26   Filed 07/29/21   Page 12 of 17   PageID #: 756

Williams has a total disability as defined by his LTD policy. Dr. Abel concluded that Williams was incapable of strenuous activity and that it would be *difficult*, but not impossible, for him to do office-based work requiring alternating between sitting and standing. In fact, none of Williams's treating physicians stated that he was totally disabled or unable to work at any occupation. The objective evidence in this case details Williams's history with pain and degenerative back issues, all of which Dr. Yaghoobian reviewed and considered in reaching his conclusion as to Williams's capabilities. Accordingly, had Dr. Kennedy's opinion not existed, Reliance's denial of benefits might not have been arbitrary and capricious, as it was arguably 'the result of a deliberate principled reasoning process' and 'supported by substantial evidence.'

However, Dr. Kennedy physically examined Williams, while Dr. Yaghoobian did not, and his report reached a definitive conclusion as to Williams's employment abilities: that he was only able to work in a part-time sedentary position. Notably, Dr. Yaghoobian seemed to agree with Dr. Kennedy on the majority of Williams's diagnoses. For instance, Dr. Yaghoobian also concluded that as of July 9, 2021, Williams had ongoing cervical and lumbar DDD, cervicalgia and lumbago, and a primary diagnosis of cervical and lumbar degenerative joint disease. (Doc. 14-1, at 314.)

Dr. Yaghoobian also noted that Dr. Kennedy's physical examination recorded that Williams had "pain in the lumbosacral region of his back and his left buttock," "muscle spasms in his left lower extremity primarily in the lower leg," "numbness and tingling in his left lower leg and left foot," "mild well-localized tenderness in the midline of the lower lumbar region and bilaterally in the SI regions and adjacent facets at the lower lumbar levels," and "2+ bilateral paraspinous muscle spasm of the lumbar region of his back," and stated that Williams "continued to have symptoms related to lumbar and cervical spine degenerative changes which are

13

supported by his physical exams." (*Id.* at 315.) However, rather than explain why he disagreed with Dr. Kennedy's conclusion as to Williams's work hours, despite all the similar findings and his acknowledgement of Dr. Kennedy's examination, Dr. Yaghoobian only provided a single sentence in explanation: "I respectfully disagree with part-time recommendation only, as the claimant has no indication to alter work hours." (*Id.* at 316.) Reliance then went on to conclude that "based on the available medical information, there is nothing to support or suggest that Mr. Williams is precluded from full-time sedentary work function." (*Id.*)

Rejection of another doctor's medical opinion cannot be done summarily; the plan administrator must "give reasons for adopting an alternative opinion." *Shaw*, 795 F.3d at 548–49. Here, Dr. Yaghoobian did not provide any reasoning for his alternative opinion other than to say he didn't see any indication in Williams's records that he should only work part time. Dr. Yaghoobian did not explain which medical records or reports supported his conclusion that Williams could work full time, nor did he identify his basis for disagreeing with Dr. Kennedy's conclusion except to state that he did. Additionally, despite having a report from an examining physician concluding that Williams was, in fact, disabled for any occupation because he could only work part time even sedentarily, Reliance itself did not give its reasons for crediting Dr. Yaghoobian and therefore adopting his alternative opinion beyond saying "there is no medical documentation to support" Dr. Kennedy's conclusion.

A consulting physician's conclusory statement that "medical information on file" does not support a plaintiff's claim suggests that the plan administrator's review process was not based on "a deliberate, principled reasoning process" and was therefore procedurally defective as to be arbitrary and capricious. *See Yates v. Bechtel Jacobs Co., LLC*, No. 3:09-cv-51, 2011 U.S. Dist. LEXIS 32464, at *46–*47 (E.D. Tenn. Mar. 28, 2011) ("In the present case, the consulting

14

physician simply stated in a conclusory fashion that 'medical information on file' did not support Plaintiff's claim. The consulting physician did not mention any of the medical documents, or provide any justification. In addition, the consulting physician did not perform a physical exam of Plaintiff, but rather, simply relied upon the medical record. This factor, coupled with LICNA's conflict of interest, provides further support that LICNA's review process was procedurally defective." (internal citations omitted)). Accordingly, this supports a finding that Reliance's denial of benefits to Williams was arbitrary and capricious.

C. **Williams's Social Security Disability Benefits**

While a disability determination made by the Social Security Administration is not binding on Reliance and, standing alone, the fact that Reliance reached a different conclusion does not render its decision arbitrary and capricious, the Sixth Circuit has nevertheless held that

> if the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious.

*Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008) (citing *Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006)).

Here, Reliance wrote to Williams on August 18, 2016, encouraging him to apply for Social Security disability payments, stating that its "files indicate [Williams] may be eligible for Social Security disability benefits," and that Reliance "believe[s] a Social Security application on [his] behalf is warranted." (Doc. 14-2, at 396.) The letter also told Williams that Reliance would help him find a representative for his Social Security claim for free for as long as he was receiving his long-term disability benefits. (*Id.*) Reliance undoubtedly benefitted from Williams qualifying for Social Security disability benefits because Williams's LTD benefit was reduced by

15

any Social Security benefit he received. (*Id.*) In fact, after Social Security approved Williams's claim for benefits in January 2019, Reliance requested that Williams pay back an overpayment of $38,049.20, which he paid on March 27, 2019. (Doc. 14-1, at 291–95; Doc. 14-2, at 489.)

Despite acknowledgement that Williams had been approved for Social Security disability benefits, Reliance reached a different conclusion, stating that:

> Each benefit provider may also be considering different medical evidence in the evaluation of a claim. For example, in Mr. Williams' situation, the SSA may not have had the results of the review completed by Dr. Yaghoobian, or other medical information RSL may have developed in his file. If the SSA were to review this information, they too may reach a similar conclusion to ours. Moreover, the receipt of SSD benefits does not guarantee the receipt of LTD benefits and vice versa.

Reliance, therefore, did not request information from Social Security prior to terminating Williams's benefits to see what was actually reviewed by the Social Security Administration, despite the fact that Williams had authorized them to do so. Reliance cannot possibly explain "why it is taking a position different from the SSA on the question of disability" if it doesn't know what SSA reviewed in reaching its determination of disability. *See Calhoun v. Life Ins. Co. of N. Am.*, 665 Fed. App'x 485, 493 (6th Cir. 2016) (*citing Bennett*, 514 F.3d at 533 n.2) ("LINA's sole mention of the SSA award in its denial letters was to note that it had considered the award but rejected it because LINA was 'in receipt of more current medical information than the [SSA] had at the time of their initial determination.' LINA failed to identify the 'more current medical information' on which it relied in reaching a contrary decision and also failed to explain why this information warranted the conclusion that Calhoun was not totally disabled. '[M]ere mention of the [SSA] decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA.'") Accordingly, this factor weighs in favor of Williams.

16

### D. On the Record Before It, the Court Cannot Determine Williams is Entitled to Benefits.

The Court finds that Reliance's denial of Williams's benefits was arbitrary and capricious when the factors outlined above are considered holistically, but where the "problem is with the integrity of [the plan's] decision-making process," rather than "that [a claimant] was denied benefits to which he was clearly entitled," the appropriate remedy generally is remand to the plan administrator. *Elliott*, 473 F.3d at 622. In this case, the Court is not able to determine based on the medical records detailed above that Williams is clearly entitled to benefits. Dr. Kennedy is the only physician who concluded that Williams was unable to work full time, and Dr. Yaghoobian disputes that conclusion, albeit with insufficient reasoning. As the Sixth Circuit has noted, the Court is not a medical specialist and therefore is not well-positioned to make medical determinations about Williams's capabilities. *See Elliott,* 473 F.3d at 622–23. Here, a remand will allow for a properly considered and explained determination of whether, in the first instance, Williams is entitled to long-term disability benefits.

### IV. CONCLUSION

For the reasons set forth above, Williams's motion for judgment on the administrative record (Doc. 21) is **GRANTED** to the extent this matter is **REMANDED** to Reliance for a "full and fair review" that is consistent with this memorandum and order. The Court **RETAINS** jurisdiction over this matter. The Clerk is **DIRECTED** to close the case. Either party may move the Court to reopen the case if doing so would be appropriate.

**SO ORDERED.**

/s/ *Travis R. McDonough*  
**TRAVIS R. MCDONOUGH**  
**UNITED STATES DISTRICT JUDGE**